[Civ. No. 1098.   Third Appellate District.—February 1, 1915.]

IRVINE & MUIR LUMBER COMPANY (a Corporation), Respondent, v. S. O. HOLMES and W. P. WHITE, Copartners, Doing Business Under the Firm Name and Style of San Hedrin Summer Resort, Defendants; S. O. HOLMES, Appellant.

ACTION FOR GOODS SOLD—COPARTNERSHIP OF DEFENDANTS—FINDING SUPPORTED BY EVIDENCE.—In this action to recover an alleged balance for goods sold to defendants as copartners, *held*, that the evidence is sufficient to justify the finding of the existence of a copartnership.

ID.—PARTNERSHIP—SHARING OF LOSSES—WHEN IMPLIED.—Where it is understood that the parties to a business transaction are to share equally the profits and that the expenses should be paid out of the proceeds of the business, there is an equal liability for the losses which the law will imply.

ID.—CONTRACT OF PARTNERSHIP—AGREEMENT PARTLY WRITTEN AND PARTLY ORAL—CONSTRUCTION OF.—Where an agreement is partly in writing, partly oral, and partly evidenced only by conduct, all the steps taken in connection with the enterprise are to be considered, for whatever was done in furtherance of the common purpose, understanding, and agreement, must be treated as part of one transaction.

ID.—PAYMENT—APPLICATION OF.—Where there are different debts due from the debtor to the creditor, and the debtor has given no direction as to the application of payments, the law will make such application in such manner, in view of all the circumstances of the case, as is most in accordance with justice and equity, and will best maintain the rights of both parties.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial.   J. Q. White, Judge.

The facts are stated in the opinion of the court.

William H. Schooler, for Appellant.

Thomas & Thomas, for Respondent.

CHIPMAN, P. J.—This is an action to recover a balance of $494.27 alleged to be due from defendants to plaintiff for goods, wares, and merchandise which, it is alleged, were sold

by plaintiff to defendants as copartners in business. Defendant White made no answer. Defendant Holmes answered and denied that he was at any time a copartner of White or that he was ever indebted to plaintiff in any sum whatever.

The cause was tried without a jury and the court found that White and Holmes were associated together in business under the firm name of San Hedrin Summer Resort; that, on August 3, 1909, defendant Holmes notified plaintiff that he would no longer be responsible for goods furnished to said resort, or for goods sold to White; that the balance due on the portion of said account that had accrued prior to said third day of August, 1909, was the sum of $373.20, and rendered judgment against defendant for that amount. Defendant Holmes appeals from the judgment and from the order denying his motion for a new trial.

Appellant presents but two objections to the judgment calling for notice; 1. That the evidence failed to establish a copartnership; 2. That the court erred in its application of payments on the account.

Some objections were made to the admissibility of certain testimony given by defendant White and plaintiff's bookkeeper, Barnett, but no notice is taken of these objections in appellant's brief and we assume that they are waived.

1. Appellant's contention is that the only relation existing between himself and White was that of landlord and tenant and he places his reliance upon a written instrument which was executed by White and Holmes in July, 1908.

It appeared that Holmes was the owner of the property known as the San Hedrin Summer Resort, situated in Mendocino County, and consisting of two hundred and forty acres of land, partly devoted to farming purposes, and in connection therewith was a hotel conducted as a pleasure resort. The written instrument signed by the parties is quite a lengthy document and pointed out in great detail the respective rights and duties of the parties and provided: ''That all profits, gain and increase that shall rise from the crops or products of the land or from the stock leased hereunder and all proceeds from the hotel and saloon and from the employment by the parties of the second part during the term of this lease in any business other or different from the business exercised under this lease shall be equally divided.'' We are satisfied from the provisions found in this document that

it imports a lease rather than a partnership, and if the relation of the parties in their subsequent dealings with each other and with the public had been in accordance with the terms of the lease the findings of the court could not be sustained.

Defendant White testified as follows: "I came from Oakland up to Mr. Holmes's place in answer to a letter he wrote me saying he wanted me to come up and see him. When I got there he made a proposition to manage his place for him, and we were to share the profits of the place, what I could make out of it as a ranch and as a summer resort. I told Mr. Holmes that I had no money, no means, but that I had experience in that business, and I had good references as to my capability, honesty, and industry, and he said that was satisfactory, and I told him that the only way that I could go into it, that I would have to have the living for the family and myself; that I was willing myself, my sons and wife and daughter, to labor, and put that, together with my knowledge of the business, against his capital, time, and property, and he said he would do that. I told him that we had nothing to live on, no money, and the place the first year I was satisfied would not pay expenses. I told him that he would have to guarantee a living for myself and family and we would put in our whole time and work for him and would try to make the place pay as a ranch and as a resort; that it would take all our time, and we would have no chance to make any money on the outside, and therefore he would have to assure me a means of living there for myself and family. He said he would do so, and if there was any month that the income from the place did not pay expenses, he would make up the deficiency, and, on that understanding, I went into business with him. He said that the understanding was that I was to run that end of the business; the family and I, and the summer resort and the saloon and bar, and he said that he would look after the city end; he would attend to all the advertising and securing the guests, in any way he could. Said he had a large business connection in the city, and a large acquaintance, he and his sons, and that he would use his utmost endeavor to send as many people up to me each season and the year around as he could; that he would do all the advertising, and make all contracts for the advertising, and would buy the liquor for the saloon and the tobacco, which he did,

during the time I was there. . . . Whatever money I could make on the place as a ranch or a summer resort was to be divided between us after paying the running expenses of the resort and ranch. I rendered him a monthly statement each and every month and made a settlement. Would send him what was coming to him; any shortage I would state and he would send it to me. Mr. Holmes worked there on the place and made himself generally useful; and if I was in the city or in town here or away, he would wait on people at the bar and saloon, and sell them liquor—those that wanted it. . . . Mr. Holmes made contracts for hay and for seed grain and paid them. Our relations continued the same all of the time we were there; up to the time Mr. Holmes repudiated these bills the relations between Mr. Holmes and myself were exactly the same up to the day I left the place.''

It appears from the testimony that the parties carried on the enterprise independently of the written agreement and upon the understanding testified to by White. Holmes spent a large part of his time at the resort and participated in its management; he bought and paid for supplies used there, regulated the running of the stages which carried passengers to and from the resort, paid deficiencies in plaintiff's monthly bills against White. Plaintiff's bills for supplies were charged to White and there is no evidence that Holmes gave any direct authority to plaintiff to furnish White or the resort with supplies or told plaintiff personally that he would be responsible for White's purchases. But plaintiff's bookkeeper, Barnett, testified that when White opened the account he stated that his arrangement with Holmes was that if the business did not pay expenses he, Holmes, ''would make up the shortage, each month.'' Settlements of bills were made monthly for several months and White testified that Holmes contributed to their payment by making up deficiencies. This condition continued until the account with plaintiff had reached quite an amount, and, White, not being able to pay it, Barnett, on August 3, 1909, went to Holmes for a settlement. He testified: ''I said. 'Mr. Holmes, you have been paying these bills heretofore,' and he said, 'Yes, I have been, but I will pay them no longer.' '' Holmes wrote many letters to White at times when he, Holmes, was in Oakland, where his family lived, which tend to show that the two men were engaged in a common enterprise to share the profits, to which White

contributed his services and the services of his family, and applying all the earnings to the expenses attending the venture.

We think the evidence was sufficient to justify the court in finding the existence of a copartnership. Appellant invites attention to the fact that there was no agreement, either oral or written, that the parties should share the losses. So far as the evidence shows, this is true. But we think where the understanding was, as in this case, that the parties were to share equally the profits and that the expenses should be paid out of the proceeds of the business, there was an equal liability for the losses which the law will imply. (Civ. Code, sec. 2404; *Quinn* v. *Quinn,* 81 Cal. 14, [22 Pac. 264].) Speaking of the rule as to what may constitute a partnership and how it may be created, it is stated, in 30 Cyc. 360; "If the agreement is partly in writing, partly oral, and partly evidenced only by conduct, then all the steps taken by the parties in connection with the enterprise are to be considered, for whatever was done in furtherance of the common purpose, understanding and agreement, must be treated as part of one common transaction."

2. The remaining question pertains to the application of payments. The court found that the balance due on that part of the account accruing prior to August 3, 1909, was $373.20 and that all payments made prior to that date "should be applied to that portion of the account which accrued prior to that date, that is, upon the partnership account, and that all payments made subsequent to said 3rd day of August, 1909, should be applied on the individual account of defendant W. P. White, and being that portion of said account which accrued after said 3rd day of August, 1909."

We do not understand that there is any controversy in regard to the amounts paid on the account or the times when paid. It is not claimed that when payments were made any direction was given as to their application and the court so found and that it remained for the law to make the application.

Appellant's contention is that all payments should have been applied to the partnership account, whether made before or after the partnership had ceased. Appellant overlooks the distinction between the account created while the partnership was in existence and the account which ran against White

after Holmes had given notice that he would no longer be liable. Here, then, were two classes of obligation, and if section 1479 of the Civil Code has any application it would seem that subdivision 3, paragraph 3, of that section authorized the application made by the court. But if section 1479 does not apply the rule is as stated in *Murdock* v. *Clarke*, 88 Cal. 384, 390, [26 Pac. 601, 603], that, "where there are different debts due from the debtor to the creditor, the law will make such application in such manner, in view of all the circumstances of the case, as is most in accordance with justice and equity, and will best maintain the rights of both parties." The principle thus stated, it seems to us, fully justified the course pursued by the court in applying payments.

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.